**Opinion issued July 20, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

**NO. 01-21-00527-CR**

————————————————

**JOE ROY COCKERHAM, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1549525**

---

**MEMORANDUM OPINION**

Appellant Joe Roy Cockerham was charged by indictment with the offense of

murder for causing the death of Alfred James by shooting him with a firearm.[1]

Cockerham claimed that he had killed James in self-defense. The jury rejected

---

[1]    *See* TEX. PENAL CODE § 19.02.

Cockerham's claim of self-defense and found him guilty of the offense of murder. After finding an enhancement allegation to be true, the jury assessed Cockerham's punishment at 80 years in prison. On appeal, Cockerham raises four issues in which he contends that he received ineffective assistance of counsel during the guilt-innocence and punishment phases of trial.

We affirm.

## Background

### A. Trial

At trial, it was undisputed that, on April 17, 2017, Cockerham killed Alfred James by shooting him with a firearm in front of the home that Cockerham shared with his mother. It was also undisputed that James lived in the same neighborhood and that James and Cockerham were arguing before the shooting. What was disputed at trial was whether James had been physically aggressive toward Cockerham before Cockerham shot him.

The evidence showed that two people witnessed the shooting: Cockerham's maternal aunt, Arlene Spriggs (Arlene),[2] and James's close friend, Kim Lewis. The State called both Arlene and Lewis to testify at trial. Arlene and Lewis each offered a different account of the events preceding the shooting. Arlene testified that James

---

[2]     We refer to Arlene Spriggs as Arlene because Cockerham has other relatives with the surname Spriggs, whose testimony we reference below.

2

was physically aggressive toward Cockerham. In contrast, Lewis testified that James was not physically aggressive toward Cockerham and said that Cockerham was the aggressor.

When she testified on direct examination, Arlene stated that, on April 17, 2017, she was visiting the home where her sister and Cockerham lived. Arlene was inside the home and heard two people arguing. After about 20 minutes, Arlene went outside to investigate and found Cockerham and James in the home's driveway arguing. Arlene stated that she knew James from the neighborhood and considered him to be a friend.

Arlene told Cockerham and James "to break it up" and stepped between them. James's car was parked on the street, and Arlene told him that he should leave. As she was walking him back to his car, James pushed her down and ran back up the driveway toward Cockerham. Arlene heard Cockerham warn James "not to run up on him or he would shoot." Arlene testified that James was within an arm's length of Cockerham and was "running directly at" him when Cockerham shot James. She said that, before the shooting, she did not see Cockerham with a gun. She heard only one gunshot and then ran into the house to call 9-1-1. She did not see any other people around before or during the shooting.

Arlene's account of what had occurred before the shooting changed on cross- and re-direct examination. Arlene then testified that she knew that James wanted to

3

fight Cockerham because she heard James tell Cockerham that he was going to "whoop" him. She saw Cockerham flash a gun at James, and James reacted by saying that he "didn't care" because he "had a gun, too." She testified that James ran back towards Cockerham, hit him, and started to "pick at" a necklace around Cockerham's neck. She heard Cockerham tell James, "Don't put your hand on me no more. If you put your hand on me, I'm going to shoot you." Arlene testified that James then hit Cockerham "a couple [of] times," and Cockerham pulled out a pistol and shot James. After the shooting, she saw James's friends at the scene surrounding his body.

Arlene testified that she never saw a weapon on James, but she did notice that "something was bulging out of [James's] pocket." She knew that James owned a gun because "everybody around there all have guns." Arlene also testified that James sold drugs because "[e]verybody sell[s] drugs."

Kim Lewis, James's "close friend," provided testimony that contradicted Arlene's testimony. Lewis testified that she was one block away when she heard a loud argument coming from Anita Street. She walked over and saw James and Cockerham arguing. She heard James tell Cockerham to slow down when driving through the neighborhood. Lewis testified that Cockerham was "irate" and told James that he could not tell him "what to do." Lewis characterized Cockerham as being "the aggressor" and "out of control." She said that Cockerham repeatedly

4

raised his shirt to show James that he had a gun. She did not see James with a gun or notice anything bulging in his pocket.

Lewis testified that she "got [James] to walk away, back to [his] car," but then Cockerham told James that if he "ran up on him" Cockerham was "going to unload." Lewis testified that James then turned back around, threw his hands up in the air, and said, "Here I go." At that point, "that's when [Cockerham] shot [James] about five times." When the shooting began, Lewis was standing "right next to [James]." They were in the street about 10 to 12 feet away from Cockerham, and Cockerham was in the yard behind a fence. She agreed that James had not been close enough to touch Cockerham. Lewis said that she ducked behind a car after the first shot. She heard a total of five shots, with a gap of five to six seconds between the first shot and the remaining four. After the first shot, James turned around "like he was trying to make it back to his car," but Cockerham then shot him in the head and in the back. Lewis testified that she never saw James reach for a weapon.

When police arrived, James was dead, lying in the street in front of Cockerham's residence. Cockerham had left the scene and a large crowd had gathered. Houston Police Sergeant J. Young, the responding homicide investigator, testified that witnesses at the scene reported that Cockerham had shot James, James had fallen to the ground, and then Cockerham had walked up to James and shot him

multiple times in the head and in the back. Police found two bags of marijuana on James and $1,889 in cash in his pockets. No gun was found on James's body.

The report from James's autopsy showed that he had sustained 10 "penetrating and perforating" gunshot wounds. Six of the gunshot wounds were to the back of his head. He had also sustained a gunshot wound to the top center of his chest. With respect to that wound, Dr. M. Hines, the assistant medical examiner who performed the autopsy, testified that the bullet had passed sharply from James's right to left side and that the barrel of the gun was pointed at James's side when the trigger was pulled. James also sustained a gunshot wound to his left shoulder, which passed from back to front, and two gunshot wounds to the back. Dr. Hines testified that none of the bullets entered James's body from the front. The autopsy report also indicated that James had "two graze injuries," including one across the front of his neck.

The defense asserted that Cockerham shot James in self-defense. Cockerham did not testify, and the defense called no witnesses. The jury was instructed on the law of self-defense, but implicitly rejected the defense, finding Cockerham guilty of the charged offense of murder.

The punishment phase of trial began the same day after the guilty finding. The indictment had included an enhancement allegation regarding a 2016 conviction for the offense of indecency with a child. Through his counsel, Cockerham pleaded true to the allegation.

The State called James's sister to testify. She described James's good qualities and expressed how much the family would miss him. She also testified regarding the close relationship that James had with his 15-year-old daughter.

The State then sought to admit an audiotape of an interview that Cockerham had given to police 10 years earlier in 2011 related to a shooting at a high school football game. The State told the trial court that Cockerham had driven a car onto the football field and that the passengers in Cockerham's car had shot at people on the field. According to the State, Cockerham admitted in the interview that he was the driver. The State said that the motivation for the shooting was gang related. Five people were hurt in the shooting, including passengers in Cockerham's car, and one person died. Cockerham was charged with the offense of deadly conduct related to the shooting, but the charge was later no-billed by the grand jury. Regarding the audiotaped interview, the State told the trial court that it was not "accusing [Cockerham] of the offense of deadly conduct." Instead, it sought to "simply play[] what [Cockerham] stated he did for the jury to hear and consider in terms of his character and his associations with criminal street gang members." The defense objected to the introduction of the audiotaped interview, and the trial court excluded the interview as being unfairly prejudicial under Texas Rule of Evidence 403.

The defense did not call any witnesses during the punishment phase.

Because he pleaded true to the enhancement allegation for the indecency-with-a-child conviction, Cockerham's punishment range was 15 to 99 years or life in prison, plus a $10,000 fine. *See* TEX. PENAL CODE § 12.42(c)(1). The jury was informed of Cockerham's plea of true to the indecency offense, but the State did not adduce any evidence of the allegations underlying the offense. The 2016 judgment of conviction for the indecency offense was admitted into evidence. It reflected that Cockerham had pleaded guilty to the indecency offense, a second-degree felony, and was sentenced to two years in prison.

In closing statements, the defense asked the jury to assess Cockerham's punishment at the minimum sentence of 15 years. The defense highlighted that Cockerham had not sought out James on the day of the shooting; rather, James had gone to Cockerham's house where Cockerham killed him during a heated argument. Counsel emphasized that Cockerham, who was 27 years old at the time of trial, was only 19 years old when he committed the indecency offense. The defense argued that Cockerham had taken responsibility for the offense by pleading guilty to it and serving his time in prison. Counsel pointed out that Cockerham was 23 years old when he killed James. The defense argued that the neighborhood where Cockerham had grown up and where the shooting occurred was a "rough area" where "everyone carries a gun" and where violence is a "way of life." Based on these mitigating

factors, the defense appealed to the jury to assess punishment at 15 years, suggesting that Cockerham could be "reformed."

The defense, in emphasizing Cockerham's youth, had referred to Cockerham as being a "child" when he committed both the indecency and murder offenses. In the State's closing argument, the prosecutor pointed out that Cockerham was not "a child" but that the victim of the indecency offense had been a child. The prosecutor argued, "A 27-year-old man after having already gone to prison for molesting a child, that's not a child. That's a man. He's not even supposed to have a gun. He's a felon. He's been to prison."

The prosecutor theorized that Cockerham had shot James because he was "offended that Alfred James confronted him, embarrassed him, and he had to assert his authority." The prosecutor reminded the jury that Cockerham shot James repeatedly and that he continued to shoot James even after he was "motionless" and "face down" on the ground. The prosecutor reviewed each bullet wound sustained by James. Regarding each shot to the back of James's head, the prosecutor emphasized, "Back of the head. Back of the head. Back of the head. Back of the head. Back of the head. Bang, bang, bang, bang, bang." The prosecutor asserted that Cockerham was not a child but was "a monster" who could not be rehabilitated. He supported this statement by pointing out that, after receiving the minimum sentence "for molesting a child," Cockerham had—within a year of getting out of prison for

9

that offense—obtained a gun and killed James. The prosecutor asked the jury to assess a life sentence in prison for Cockerham. He argued that Cockerham could not change and that a life sentence was the only way to "keep this community safe."

The jury assessed Cockerham's punishment at 80 years in prison.

## B.    Motion for New Trial

Cockerham filed a motion for new trial in which he claimed that he had received ineffective assistance of counsel at both the guilt-innocence and punishment phases of trial. He argued that his trial counsel's performance was deficient because (1) counsel did not impeach Kim Lewis with a pending felony-drug charge and four prior felony-drug convictions; (2) counsel did not investigate and call eight witnesses who were available and willing to testify at both phases of trial regarding Cockerham's good character, and (3) counsel did not inform Cockerham, who wanted to testify at trial, that it was his decision alone whether to testify.[3]

In support of his motion for new trial, Cockerham offered certified copies of records showing that Lewis had been convicted of four felony offenses of possession of a controlled substance between 2012 and 2017 and that, at the time of his trial,

---

[3]    On appeal, Cockerham recognizes that his trial counsel testified in his post-trial affidavit that he informed Cockerham of his right to testify, but Cockerham decided not to testify. Cockerham states, "Because the trial court was entitled to believe trial counsel over [him], [he] does not press this claim on appeal."

10

Lewis had a pending possession-of-a-controlled substance charge. The evidence also showed that, six days after she testified at Cockerham's trial, Lewis pleaded guilty to the drug charge as part of a plea bargain and received two years of deferred-adjudication community supervision.

In support of his motion for new trial, Cockerham also offered his own affidavit, the affidavit of his trial counsel, and the affidavits of eight of his relatives and friends who testified that they would have appeared at trial as character witnesses for Cockerham. The trial court conducted a hearing on the motion for new trial. The motion and the affidavits and documentary evidence supporting it were admitted into evidence at the hearing. Cockerham and six of the eight affiants testified at the hearing. Although his affidavit was admitted into evidence, Cockerham's trial counsel did not testify at the hearing.

Cockerham's parents, Mary Spriggs and Joe Cockerham II, had signed sworn affidavits that were admitted into evidence. They also testified at the hearing on the motion for new trial. They stated that they had retained trial counsel to represent Cockerham. They had met with counsel to discuss the case and had spoken with him on the phone. Cockerham's father stated that trial counsel never spoke to him about testifying as a character witness for his son or asked him if he knew others who could be character witnesses. Cockerham's mother stated that she told trial counsel that she wanted to testify as a character witness for her son, but trial counsel responded

11

that he did not want to call her or any character witnesses because "the prosecutor [would then] 'come down hard' on [Cockerham] and that it would be worse for [Cockerham]."

Cockerham's father testified that trial counsel never asked him what he knew about James. He attested that, had he been asked, he would have testified that he had heard that James was a drug dealer, had a reputation for being violent, was a "big bully" who would "jump on guys and fight."

Cockerham's mother averred that she would have testified that she knew that James was a drug dealer and that "he was known to carry a gun." She said that she also would have testified that James "had a reputation for being a violent bully who would threaten people and get into fights." She stated that, "[i]f allowed, [she] would have testified that [she] had heard that [James] had pulled a gun on another man during an argument about two weeks before the shooting."

Cockerham's parents confirmed that they would have testified at the guilt-innocence phase that Cockerham was a non-violent person. And they would have testified at the punishment phase that Cockerham was a good and kind person, who had cared for his bedridden grandfather. They said that Cockerham was a loving father to his young son and stepdaughter. Cockerham's father also testified that Cockerham had cooked and passed out meals for the homeless on Thanksgiving.

On cross-examination, the State questioned Cockerham's mother about what she knew regarding the 2011 deadly-conduct charge against Cockerham relating to the shooting at a high school football game. The State also questioned her about whether she was familiar with the details underlying Cockerham's conviction for the offense of indecency with a child. She testified that Cockerham had originally been charged with two offenses: aggravated-sexual assault of a child and indecency with a child. She was aware that the aggravated-sexual-assault-of-a-child charge was dismissed when Cockerham pleaded guilty to the indecency-with-a-child offense. She knew that the complainant in the indecency-with-a-child case was Cockerham's younger half-sister, who was between eight and ten years old at the time of the offense. She testified that the underlying allegations were that Cockerham had made his half-sister perform oral sex on him numerous times. She stated that, even knowing that information, she believed Cockerham to be a non-violent person. In addition, she acknowledged that, while he was "on bond for that sexual assault charge," Cockerham was charged with a new offense: "fraudulent possession of identifying information." She was also aware that Cockerham had been arrested for criminal trespass and convicted of criminal mischief.

The State asked Cockerham's father whether he knew that Cockerham had been involved in multiple fights while in jail awaiting trial on the murder charge.

13

His father stated that he did not know that and confirmed that it would not change his opinion that his son was a non-violent person.

Cockerham's sister, Re'Andrea Spriggs, and his cousin, Tiffany Tennard-Ivery, testified in their affidavits and at the hearing that they would have appeared as character witnesses for Cockerham, but they were never contacted by Cockerham's trial counsel. Tennard-Ivery stated that she spoke to trial counsel outside the courtroom during trial, telling him that she wanted to testify. She also asked him whether he planned to call character witnesses, and he responded that "he didn't want to call any character witnesses." She stated that she would have testified that Cockerham was not a violent person. Rather, he was humble, a hard worker, and "a caring father" who was actively involved in raising his son. She also said that Cockerham had been a caretaker to his bedridden grandfather. Similarly, Re'Andrea Spriggs testified that she would have told the jury that Cockerham was not a violent person and that he was "supportive," "caring," and the kind of person "you can always talk to."

Family friend, Tiffany Taylor, provided affidavit and live testimony. She testified that trial counsel never asked her to testify even though she attended the trial and trial counsel knew who she was. Taylor provided testimony similar to the other witnesses, stating that Cockerham was non-violent and had a good character. She also testified that she was aware of the facts of the deadly-conduct case because

14

her son was shot during the incident. She credited Cockerham with saving her son's life by driving him away from the scene.

Another sister, Christina Spriggs, and Cockerham's brother, Rashad Willis, provided affidavit testimony but did not testify at the new-trial hearing. In their affidavits, they stated that they were not contacted by trial counsel but would have testified as character witnesses had they been asked. Their affidavits related that Cockerham was a non-violent person and described his good character.

Cockerham's girlfriend, S. Johnson, provided affidavit and live testimony. Johnson testified that she was the mother of Cockerham's five-year-old son and that she had an eight-year-old daughter from a previous relationship. She said that trial counsel never contacted her to testify as a character witness, but, had she been called, she would have testified that Cockerham was not a violent person. She described Cockerham as a "hard worker" and a "good father," who helped her pay her bills. She stated that her daughter had a "close bond" with Cockerham and viewed him as her father. She indicated that Cockerham was involved in her daughter's and their son's lives. She stated that Cockerham tried to remain part of the children's lives, despite being in jail, by regularly calling them. She also said that, while he was in jail awaiting trial, Cockerham supported her while she underwent chemotherapy for cancer and had COVID-19.

On cross-examination, Johnson denied knowing that Cockerham was "dealing drugs along with [James]." Johnson testified that she began dating Cockerham after he was accused of indecency with a child but before he went to prison for that offense. She indicated that she had no concerns regarding Cockerham being around her daughter even though she knew that he was a registered sex offender. On further cross-examination, she revealed that she was not aware of the details underlying the indecency offense. When asked by the State, she denied that Cockerham had recently gotten "a little aggressive and physical with [her]."

Cockerham also testified in support of the motion for new trial. He testified that he told his trial counsel that he wanted to testify at trial, but counsel told him not to testify because the State could "bring up" his indecency conviction. He stated that he had worked as an auto mechanic but had also sold drugs for James to earn extra money. He claimed that, not long before the shooting, James had learned about his indecency-with-a-child conviction. He said that, after that, James had started harassing him, calling him a molester, and making threats against him. Cockerham's testimony indicated that, at the time of the shooting, James was physically aggressive toward him and that he had acted in self-defense in response to the aggression.

In his post-trial affidavit, trial counsel addressed Cockerham's allegations that he had provided deficient representation at trial. He testified that he did not call character witnesses to testify for Cockerham during either phase of trial because he

16

"was concerned that the prosecutor would cross-examine [the witnesses] about [the] deadly conduct charge Mr. Cockerham had in 2011."

Trial counsel testified that he "was aware" that Kim Lewis "had a pending felony drug case in Harris County at the time of trial," but he "did not cross-examine her about it because the prosecutor told [him] that, if [he] did, [the prosecutor] was going to bring up Mr. Cockerham's criminal history in front of the jury." He "did not want that to happen, so [he] did not question Ms. Lewis about that case."

Trial counsel averred that, before trial, he spoke to Cockerham's parents and to Cockerham's aunt, Arlene Spriggs. Cockerham's mother, Mary Spriggs, told him that she did not want to testify "because she was afraid [that] she might be killed if she did." Trial counsel stated that Mary "did not even want her sister Arlene to testify for the same reason." He stated that Cockerham's father "did not indicate to [him] in any way that he wanted to testify." He noted that Cockerham's father "was unaware that his son had ever been to [prison] so it did not seem like he knew his son well."

Trial counsel testified that he "did not call any character witnesses about [James's] reputation for violence or carrying a gun because [he] was unaware such evidence existed." He stated that Cockerham's parents did not tell him "any information" about James. He also testified that Arlene "did not tell [him] that [James] was violent." To the contrary, trial counsel testified that she told him,

17

"consistent with the interview she gave to the police, that the complainant [James] was a good man would not hurt anyone." Besides Cockerham's parents and his aunt, trial counsel "did not know about any of Mr. Cockerham's other relatives or family friends." Neither Cockerham, his parents, nor his aunt "informed [him] that there were other relatives who knew about [James]." He attested that "[n]o relative ever called me to say that they had information about [James]."

Trial counsel explained that he "did not want to call any character witnesses for Mr. Cockerham during punishment because, if [he] did, the prosecutor was going to cross-examine them about Mr. Cockerham's criminal history." For that same reason, trial counsel stated that he also advised Cockerham not to testify at the punishment phase and that Cockerham agreed not to testify.

Counsel acknowledged that he did not speak with Johnson, "though [he] knew she was the mother of Mr. Cockerham's son." He "did not seek out any of Mr. Cockerham's relatives or family" because "any favorable character evidence they could have provided would have caused Mr. Cockerham's deadly conduct charge to be introduced at guilt/innocence and would have caused all of his criminal history to come in at punishment."

The State called one of the assistant district attorneys who had prosecuted the case. He confirmed that, if the defense had called character witnesses during the

punishment phase, the prosecution had intended to cross-examine them about Cockerham's entire criminal history, including cases that had been dismissed.

The trial court orally denied Cockerham's motion for new trial without issuing findings of fact and conclusions of law. This appeal followed

## Ineffective Assistance of Counsel

In four issues, Cockerham contends that he received ineffective assistance of counsel during the guilt-innocence and punishment phases of trial.

## A.     Standard of Review and Applicable Law

When, as here, an appellant presents a claim of ineffective assistance of counsel in a motion for new trial, we analyze the ineffective-assistance issue as a challenge to the denial of the motion for new trial, and we view the relevant legal standards through the prism of abuse of discretion. *See Robinson v. State*, 514 S.W.3d 816, 823 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *Ramirez v. State*, 301 S.W.3d 410, 415 (Tex. App.—Austin 2009, no pet). An abuse of discretion occurs only when no reasonable view of the record would support the trial court's ruling. *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013). Applying this deferential standard, we will hold that a trial court has abused its discretion when its decision is so clearly wrong as to lie outside the zone of reasonable disagreement. *See Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992). In other words,

we reverse only if the trial court's ruling was clearly erroneous and arbitrary. *Okonkwo*, 398 S.W.3d at 694.

When applying the abuse-of-discretion standard, we view the evidence in the light most favorable to the trial court's ruling on the motion for new trial. *State v. Thomas*, 428 S.W.3d 99, 104 (Tex. Crim. App. 2014). The trial court, as factfinder, is the sole judge of witness credibility at a new-trial hearing with respect to both live testimony and affidavits. *Okonkwo*, 398 S.W.3d at 694. We must afford almost total deference to a trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Id.* We afford the same deferential review to the trial court's determination of historical facts based solely on affidavits, regardless of whether the affidavits are controverted. *Id.* In the absence of express findings, as here, we presume that the trial court made all findings in favor of the prevailing party. *Id.* We impute implicit factual findings that support the trial court's ultimate ruling on the motion for new trial when such implicit factual findings are both reasonable and supported in the record. *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005); *see Escobar v. State*, 227 S.W.3d 123, 127 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

Allegations of ineffective assistance of counsel must be firmly rooted in the record. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). To establish ineffective assistance of counsel, a defendant must prove (1) that his trial counsel's

performance was deficient and (2) that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant bears the burden of proving by a preponderance of the evidence that counsel was ineffective. *See id.*; *Prine v. State*, 537 S.W.3d 113, 116 (Tex. Crim. App. 2017). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

Under the first *Strickland* prong, counsel's performance is deficient if it falls below an objective standard of reasonableness. *See id.* at 688. Any judicial review of whether counsel's performance was deficient "must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). A court must engage in a strong presumption that counsel's conduct fell within the wide range of reasonable assistance and that the complained-of act or omission might be considered sound trial strategy. *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Id.* "The *Strickland* test is judged by the 'totality of the representation,' not by counsel's isolated acts or omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight." *Id.*

To establish prejudice under the second *Strickland* prong, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 694). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. A defendant must show more than "that the errors had some conceivable effect on the outcome of the proceeding." *Perez*, 310 S.W.3d at 894 (quoting *Strickland*, 466 U.S. at 693). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland*, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

To show prejudice from professional errors during the guilt-innocence phase, a defendant must prove that there was a reasonable probability that, but for his attorney's professional errors, the jury would have had a reasonable doubt about his guilt. *See Perez*, 310 S.W.3d at 893–94. And, to establish prejudice from punishment-stage errors, a defendant must show "a reasonable probability that, but for counsel's errors, the sentencing jury would have reached a more favorable verdict." *Ex parte Rogers*, 369 S.W.3d 858, 864 (Tex. Crim. App. 2012).

**B.     Lewis's Past Drug Convictions and Pending Drug Charge**

In his first issue, Cockerham complains that trial counsel was "ineffective by failing to impeach the State's most important witness, Kim Lewis, with her pending felony [drug] charge and four impeachable felony [drug] convictions." Cockerham points out that "[o]nly two eyewitnesses to the shooting testified at [Cockerham's trial]: Arlene Spriggs and Kim Lewis." He notes that "Arlene gave testimony that supported [Cockerham's] claim of self-defense" while Lewis's "testimony unequivocally did not support [the defense]." Cockerham asserts "[t]hat [the pending] charge gave Lewis . . . a powerful motivation to lie to curry favor with the State." He claims, "Had trial counsel cross-examined Lewis about her pending case and past convictions, the jury would have had a strong basis to disbelieve her testimony and find [Cockerham] not guilty."

Cockerham asserted that Lewis's four prior drug convictions were admissible under Texas Rule of Evidence 609(a). Rule 609(a) provides that evidence of a criminal conviction offered to impeach a witness's character for truthfulness is admissible if the crime was a felony, the probative value of the evidence outweighs its prejudicial effect, and it is elicited from the witness or established by public record. *See* TEX. R. EVID. 609(a). To support his assertion, Cockerham offered as new-trial evidence certified copies of four judgments of conviction reflecting that

23

Lewis was convicted of the state-jail felony offenses of possession of a controlled substance in 2013, 2014, 2016, and 2017.

Rule 609(a) does not govern the admissibility of a pending criminal charge. Instead, to impeach a witness with evidence of a pending criminal action, the proponent of the evidence must establish that the evidence is relevant. *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998). To show that such evidence is relevant as a potential source of bias, the defendant must show some causal connection or logical relationship between a witness's pending charges and her potential bias to testify favorably for the State. *See Irby v. State*, 327 S.W.3d 138, 148–49 (Tex. Crim. App. 2010).

To support his claim that trial counsel had performed deficiently by failing to impeach Lewis with her pending drug charge, Cockerham introduced into evidence an order of deferred adjudication. The order reflected that, one week after she testified at Cockerham's trial, Lewis pleaded guilty to the state-jail felony offense of possession of a controlled substance in a Harris County district court. The instant offense was also prosecuted in Harris County district court albeit in a different trial court. The deferred-adjudication order also showed that, after pleading true to two enhancement allegations, Lewis was placed on deferred-adjudication community supervision for two years. Cockerham asserts that was the minimum sentence that Lewis could have received as a habitual state-jail-felony offender. *See* TEX. PENAL

24

CODE § 12.425. Cockerham suggests that, because this was sufficient to show a connection between the pending charge and a bias or motive for Lewis to testify in favor of the State, trial counsel should have impeached Lewis with the pending drug charge.

In his affidavit, trial counsel did not address why he did not impeach Lewis with her past drug convictions, but he did address why he did not impeach Lewis with the pending charge. Trial counsel testified that he did not cross-examine Lewis about her pending drug charge because "the prosecutor told me that, if I did, he was going to bring up Mr. Cockerham's criminal history in front of the jury. I did not want that to happen, so I did not question Ms. Lewis about that case." Cockerham asserts that trial counsel's "justification shows that he did not understand the law" because "[i]mpeaching a witness with a pending charge has no impact on whether a prosecutor can bring up a defendant's criminal history, otherwise inadmissible under Rule 404, during the guilt/innocence phase of a trial." He asserts that "[a] decision to forego a valuable line of cross-examination based on a misunderstanding of the law cannot be reasonable or strategic."

Even if we assume that trial counsel performed deficiently by not impeaching Lewis with her prior drug convictions and pending drug charge, Cockerham did not show a reasonable probability that impeaching Lewis would have changed the outcome of his trial as required under the second *Strickland* prong. *See Strickland*,

25

466 U.S at 694. Lewis's testimony about the events preceding the shooting was corroborated by other evidence admitted at trial. Lewis testified that, after Cockerham fired the first shot, James turned around "like he was trying to make it back to his car," but "that's when [James] got shot." Lewis testified that James "was trying to get away, back to his car." She said that Cockerham then shot James several times in the back and in the back of his head. Lewis's testimony was consistent with the autopsy report, which showed that all of the bullets struck James from the side or from the back.

In her version of the events, Arlene testified on direct examination by the State that James was within an arm's length of Cockerham and "running directly at" him when Cockerham shot James. She confirmed that James "wasn't turned around or retreating" when he was shot. Dr. Hines, who performed Cockerham's autopsy, testified that none of the bullets struck Cockerham from the front. Although she stated on cross-examination and on re-direct that James was shot after he struck Cockerham, rather than when he was running directly at him, Arlene did not state that James was turned away or retreating from Cockerham at the time.

Arlene also testified that Cockerham shot James in the driveway. In that regard, her testimony did not vary. She was adamant that both men were in the driveway when Cockerham shot James. She testified that she saw James fall to the ground when he was shot. When asked, she agreed that it "all happened in the

driveway." But, according to Lewis, James was never in the driveway. She testified that, when the shooting began, James was standing in the street and Cockerham was in the driveway behind the fence approximately 10 to 12 feet away from James. Lewis stated that "[James] stayed in the street" and "never went up on the sidewalk or in the driveway." Crime scene photos admitted into evidence showed James's body was in the street, not in the driveway. Sergeant Young testified that, when he arrived at the scene, James's body was lying in the middle of the street. He testified that James's body had not been moved. Lewis also testified that James did not have a weapon, and no weapon was found on James's body. Thus, Lewis's testimony was consistent with the physical evidence at the scene.

The jury also heard evidence indicating that neither Lewis nor Arlene were disinterested witnesses. Lewis testified that she and James were close friends. When asked how close she was to him, she responded, "Very close." She explained, "He's not blood, but he is like a brother." When asked how often she saw James, Lewis said, "Every day." Arlene was Cockerham's maternal aunt and testified that Cockerham was important to her and that she loved him. She confirmed that she "[didn't] want to see him go away for a long time." Thus, even without the impeachment evidence, the jury heard testimony relevant to the witnesses' credibility, motives, and biases. In addition, while Lewis's version of the events remained consistent on both direct and cross-examination, Arlene's account of the

27

events changed on cross-examination and re-direct, potentially undermining her credibility.

Finally, other evidence aside from Lewis's testimony undermined Cockerham's self-defense claim. The evidence—including witness testimony, the autopsy report, and the crime scene photos—showed that Cockerham shot James repeatedly from behind. The evidence showed that Cockerham shot James at least 10 times, including six times in the back of the head and twice in the back. The evidence indicated that James was lying on the ground when Cockerham shot him in the back and in the back of the head. We note that courts have recognized that such evidence serves to negate a claim of self-defense. *See Johnson v. State*, 452 S.W.3d 398, 404 (Tex. App.—Amarillo 2014, pet. ref'd.) ("[T]hat Appellant walked up to Armstrong after the first shot and shot Armstrong a second time in the back while he lay on the floor, if believed by the jury, is evidence negating his claim of self–defense."); *Cleveland v. State*, 177 S.W.3d 374, 381 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (determining that jury could have reasonably concluded that defendant's conduct in continuing to stab his wife's back as she lay bleeding on floor was inconsistent with his claim of self-defense).

Based on the new-trial record, the trial court could have reasonably determined that Cockerham did not establish that there was a reasonable probability that the result of the trial would have been different had trial counsel impeached

28

Lewis with her past drug convictions and pending drug charge. *See Strickland*, 466 U.S. at 694. For this reason, we hold that the trial court did not abuse its discretion when it denied Cockerham's motion for new trial on the ground that trial counsel was ineffective for not impeaching Lewis.

We overrule Cockerham's first issue.

## C. Evidence of James's Reputation for Violence

When self-defense is raised in a murder prosecution, a defendant may introduce evidence of the complainant's violent character in certain circumstances. *See* TEX. R. EVID. 404(a)(3); *Ex parte Miller*, 330 S.W.3d 610, 618–19 (Tex. Crim. App. 2009). For instance, the defendant may offer reputation or opinion testimony or evidence of specific prior acts of violence by the complainant to show the reasonableness of the defendant's claimed fear of danger from the complainant. *See Ex parte Miller*, 330 S.W.3d at 618–19; *Green v. State*, 589 S.W.3d 250, 258–59 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd). In his second issue, Cockerham contends that trial counsel "was ineffective by failing to investigate and call [Cockerham's parents] Mary Spriggs and Joe Cockerham II as character witnesses during the guilt/innocence phase regarding [James's] reputation for violence and carrying a gun."

The new-trial record shows that Cockerham's father, Joe, testified that he had not known James personally, but he had heard that James was a drug dealer. He also

29

had heard that James had a violent reputation as a "big bully" who would "fight and jump on guys." Joe said that he would have testified about James's violent reputation, but trial counsel never asked him what he knew about James.

Cockerham's mother, Mary, attested that she would have testified at trial. She stated that she would have testified that James was a drug dealer, who "was known to carry a gun." She also would have testified that James "had a reputation for being a violent bully who would threaten people and get into fights." She had learned that, two weeks before his death, James had pulled a gun on another man during a fight.[4] Mary testified that she told trial counsel what she knew about James's reputation, but he did not want to call her or any witnesses testify.

Trial counsel attested in his affidavit that Mary did not want to testify because she was afraid that she might be killed if she did.[5] He testified that Joe "did not

---

[4]  The State disputes whether Mary's testimony about James pulling a gun during a fight two weeks before he was killed would have been admissible. For purposes of our analysis, we assume, without deciding, that it would have been admissible.

[5]  To demonstrate ineffective assistance of counsel based on an uncalled witness, an appellant must show (1) that the witness would have been available to testify and (2) that the witness's testimony would have been of some benefit to the defense. *See Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007). The State asserts that trial counsel's affidavit testimony that Mary did not want to testify because she was afraid of being killed sufficiently showed that she was unwilling to testify and thus unavailable to testify. Cockerham responds that, even if counsel's affidavit supported an inference that Mary was unwilling to testify, trial counsel had a duty to subpoena her. However, "the decision whether to subpoena witnesses and to question them is trial strategy, and, as such, a prerogative of trial counsel." *Hill v. State*, 666 S.W.2d 663, 668 (Tex. App.—Houston [1st Dist.] 1984), *aff'd*, 686 S.W.2d 184 (Tex. Crim. App. 1985). "Matters of trial strategy will be reviewed only

indicate to me in any way that he wanted to testify." He stated that he "did not call any character witnesses about [James] reputation for violence or carrying a gun because [he] was unaware such evidence existed." He said that Mary and Joe "did not tell [him] any information about [James]."

In his brief, Cockerham acknowledges that the trial court, as the sole judge of the weight and credibility of the evidence, was entitled to believe trial counsel's affidavit testimony and to disbelieve Mary's and Joe's testimony. *See Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999). Cockerham asserts that, "even assuming that it is completely truthful, counsel's affidavit does not—and cannot— justify his failure to *investigate* what Mary and Joe knew about [James'] reputation for violence and carrying a gun." Cockerham contends that trial counsel's affidavit was "tacit admission that he abdicated his responsibility to investigate evidence of [James's] reputation for violence and carrying a gun, relying instead on Mary and Joe to volunteer that information (without being asked) and to volunteer themselves for testimony." Cockerham claims that, "[h]ad trial counsel [investigated], he would

---

if an attorney's actions are without any plausible basis." *Simms v. State*, 848 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd). Mary's fearful reluctance to testify presented a plausible basis for a strategic decision by trial counsel not to subpoena her. *See Igwe v. State*, No. 14-98-00594-CR, 2000 WL 1508807, at *3 (Tex. App.—Houston [14th Dist.] Oct. 12, 2000, pet. ref'd) (not designated for publication) (holding that counsel's "decision not to subpoena uncooperative character witnesses was a strategic one which falls within the ambit of effective assistance"). Thus, the trial court could have determined that trial counsel did not perform deficiently in not calling Mary to testify at the guilt-innocence phase.

have learned of the extremely important character information Mary and Joe could have provided about [James]."

A defendant's counsel has a duty to make reasonable investigations or to make a reasonable decision that a particular investigation was unnecessary. *Strickland*, 466 U.S. at 691. Counsel's failure to conduct an adequate investigation may constitute ineffective assistance. *See Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003). Part of the duty to investigate is counsel's responsibility to seek out and interview potential witnesses. *Ex parte Welborn*, 785 S.W.2d 391, 394 (Tex. Crim. App. 1990). A decision by counsel not to conduct a particular investigation is directly assessed for reasonableness in all the circumstances, and appellate courts are required to provide a heavy measure of deference to counsel's judgments. *Strickland*, 466 U.S. at 691; *Butler v. State*, 716 S.W.2d 48, 54 (Tex. Crim. App. 1986). To determine whether an appellant was prejudiced from a failure to investigate and present evidence, this Court must "compare the evidence presented by the State with the 'evidence the jury did not hear due to trial counsel's failure to investigate.'" *Perez*, 310 S.W.3d at 896 (quoting *Butler*, 716 S.W.2d at 56).

On appeal, Cockerham claims that trial counsel's "failure to investigate and present this character evidence was not only deficient but also prejudicial." He asserts that Mary's and Joe's "testimony would have given the jury additional evidence to support [Cockerham's] self-defense claim." It would have given the jury

"another data point . . . to credit Arlene's testimony over Lewis's" had the jury "heard testimony that [James's] assault of [Cockerham] was consistent with a broader reputation for violence." But, even assuming these assertions to be correct, the new-trial record does not show that Cockerham met the bar for reversal.

An appellate court will not reverse a conviction based on a failure to investigate unless the consequence of that failure "is that the only viable defense available to the accused is not advanced." *Donald v. State*, 543 S.W.3d 466, 477 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see Bahr v. State*, 295 S.W.3d 701, 712 (Tex. App.—Amarillo 2009, pet. ref'd). Here, the record shows that Cockerham's trial counsel advanced his claim of self-defense by eliciting testimony from Arlene and by cross-examining Lewis. On cross-examination, trial counsel questioned Lewis about a recorded statement that she had given to police following the shooting and attempted to show inconsistencies between her statement and her trial testimony. Trial counsel elicited testimony from Arlene that James had gone to Cockerham's driveway to fight Cockerham. Arlene stated that she knew James wanted to fight because she heard James tell Cockerham that he would "whoop" him. Trial counsel elicited additional testimony that Cockerham shot James after James struck him. Arlene further testified that, although she never saw a weapon on James, she noticed "something was bulging out of [James's] pocket." Counsel

elicited additional testimony from Arlene that James was a drug dealer and that he owned a gun.

Arlene also provided testimony supporting Cockerham's self-defense theory when questioned by the State, alleviating the need for defense counsel to pursue further questioning. On direct examination by the State, Arlene indicated that James was the aggressor. She testified that she tried to walk James back to his car, but he pushed her to the ground and turned back to confront Cockerham. She initially said that James was within an arm's length of and running directly at Cockerham when he was shot. On redirect by the State, Arlene testified that James told Cockerham he "had a gun, too." She elaborated on her statement that James struck Cockerham by testifying that, after Cockerham told James not to strike him again, James continued to strike Cockerham. Arlene testified that, at that point, Cockerham shot James.

The record shows that Cockerham's trial counsel used Arlene's testimony to advance the theory of self-defense by providing the jury with an explanation of why Cockerham felt the need to resort to lethal force against Cockerham. The fact that the jury rejected the claim of self-defense does not change that. Thus, the trial court could have reasonably found that Cockerham was not deprived of a viable defense. Based on that finding, the trial court could have concluded that Cockerham failed to satisfy, if not the deficiency prong of *Strickland*, then the prejudice prong. *See Cantu v. State*, 993 S.W.2d 712, 721 (Tex. App.—San Antonio 1999, pet. ref'd). We hold

that the trial court did not abuse its discretion in denying Cockerham's motion for new trial on the ground that trial counsel was ineffective for not investigating and offering evidence of James's reputation for violence.

We overrule Cockerham's second issue.

## D. Evidence of Cockerham's Non-violent Character

A criminal defendant "is permitted to introduce evidence of a specific good-character trait to show that it is improbable that he committed the charged offense, when that character trait is relevant to the offense." *See Melgar v. State*, 236 S.W.3d 302, 306–07 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *see* TEX. R. EVID. 404(a)(2)(A). A character trait is relevant if it is "one that relates to a trait involved in the offense charged or a defense raised." *Melgar*, 236 S.W.3d at 307. "In a murder case, the accused's reputation for peacefulness, or non-aggressive behavior, is the appropriate inquiry." *Valdez v. State*, 2 S.W.3d 518, 520 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd).

In his third issue, Cockerham contends that trial counsel was ineffective "by failing to investigate and call any character witnesses during the guilt/innocence phase of trial to testify" about Cockerham's non-violent character. As new-trial evidence, Cockerham offered the testimony of eight witnesses—family members and friends—who stated that they would have testified at the guilt-innocence phase regarding Cockerham's non-violent character.

35

Under Texas Rules of Evidence 404 and 405, if a defendant offers evidence of his good character, the prosecution can introduce its own character evidence to rebut the implications of the defendant's character evidence. *Harrison v. State*, 241 S.W.3d 23, 27 (Tex. Crim. App. 2007); *see* TEX. R. EVID. 404(a)(2)(A), 405(a)(2)(B). Rebuttal evidence may be elicited by cross-examination in the form of "have you heard" or "were you aware" questions about specific instances of conduct inconsistent with the character trait brought into issue. *Harrison*, 241 S.W.3d at 25. The prior instances must be relevant to a character trait at issue, and they must have a basis in fact. *Wilson v. State*, 71 S.W.3d 346, 351 (Tex. Crim. App. 2002).

Recognizing the State's right of rebuttal, trial counsel testified in his affidavit that he "did not want to call any character witnesses for Mr. Cockerham about his reputation for nonviolence during guilt/innocence because [he] was concerned that the prosecutor would cross-examine them about a deadly conduct charge Mr. Cockerham had in 2011 (which had been no billed by the grand jury)," related to a shooting at a high school football game. Trial counsel testified that he spoke with Cockerham's parents and his aunt, Arlene, but he "did not speak with [S.] Johnson, though [he] knew she was the mother of Mr. Cockerham's son." Nor did he "seek out any of Mr. Cockerham's relatives or family friends to interview" because "any favorable character evidence they could have provided would have caused Mr. Cockerham's deadly conduct charge to be introduced at guilt/innocence . . . ."

36

"An attorney's failure to investigate or present witnesses will be a basis for establishing ineffective assistance of counsel only where it is shown that the witnesses would have been available and that the presentation of the evidence would have benefitted appellant." *Pinkston v. State*, 744 S.W.2d 329, 332 (Tex. App.—Houston [1st Dist.] 1988, no pet.); *see Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007) (stating that, to demonstrate ineffective assistance of counsel based on failing to call witness, appellant must show that (1) witness would have been available to testify and (2) witness's testimony would have been of some benefit to defense). "[W]hen in counsel's reasonable judgment, a possible witness is as potentially dangerous as he or she might be helpful, it is not ineffective assistance to not call the witness to the stand." *Damian v. State*, 881 S.W.2d 102, 110 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd); *see Hale v. State*, 140 S.W.3d 381, 393–94 (Tex. App.—Fort Worth 2004, pet. ref'd) (concluding that decision not to call potential witnesses during guilt-innocence phase of trial to avoid exposing witnesses to cross-examination and "have you heard" questions concerning extraneous offenses constituted sound strategy). "That other counsel might have made a different decision regarding whether to talk to or call the witness to the stand does not render trial counsel's assistance ineffective." *Damian*, 881 S.W.2d at 110.

Cockerham asserted that it was unreasonable for trial counsel to believe that the State could impeach his witnesses' character testimony during the guilt-

innocence phase by cross-examining them with questions about the deadly-conduct charge. Cockerham pointed out that cross-examination of a character witness with questions about prior instances of conduct may be prohibited under Rule of Evidence 403 if the probative value of the cross-examination evidence is substantially outweighed by the danger of its unfair prejudice. *See Ex parte Miller*, 330 S.W.3d at 621 n.26; *Harris v. State*, 572 S.W.3d 325, 334 (Tex. App.—Austin 2019, no pet.). He asserted that trial counsel could have made a Rule 403 objection to the State's questioning about the deadly-conduct charge.

In reviewing a trial court's determination under Rule 403, an appellate court should reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). Under Rule 403, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. The rule "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). A Rule 403 analysis must balance (1) the inherent probative force of the proffered item of evidence, along with (2) the proponent's need for that evidence, against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given

undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

To show that it was unreasonable for his trial counsel to have based his decision not to call character witnesses on the State's ability to cross-examine the witnesses with questions about the deadly-conduct charge, Cockerham needed to show that the trial court would have abused its discretion in overruling a Rule 403 objection to the cross-examination. *See Cavitt v. State*, 507 S.W.3d 235, 258 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (explaining that, to show counsel was deficient for introducing evidence of appellant's prior convictions, appellant needed to show that trial court would have abused its discretion by admitting such evidence). In other words, if it was within the trial court's discretion to overrule a Rule 403 objection, then the trial court could have reasonably found, when denying the motion for new trial, that Cockerham failed to show that no reasonable counsel would have believed that the State could cross-examine Cockerham's character witnesses about the deadly-conduct charge. Cockerham points out that, when the State sought to introduce the evidence related to the deadly-conduct case during its case-in-chief in the punishment phase, the trial court granted his objection to the evidence under Rule 403 on the basis that the evidence was unfairly prejudicial. Cockerham asserts that

"[t]here is no reason to expect that the trial court would have ruled any differently on a Rule 403 objection" to the deadly-conduct evidence when offered to impeach the character testimony of Cockerham's family and friends during the guilt-innocence phase.

When it granted Cockerham's Rule 403 objection during the punishment phase, the trial court stated that the deadly-conduct evidence was "more prejudicial than probative." But, because it was not required, the trial court did not state how it weighed each of the six *Gigliobianco* factors in reaching its decision. *See* 210 S.W.3d at 641–42. As Cockerham emphasizes, the remoteness of the deadly-conduct charge, being ten-and-a-half years before trial, and its no-billed status likely weighed against its probative force—that is, how strongly it served to make more or less probable the existence of a fact of consequence to the litigation. *See id.* at 641; *Ex parte Miller*, 330 S.W.3d at 621. But, even if the trial court found that the probative force of the deadly-conduct charge was weak with respect to its admissibility for impeachment purposes, there were other factors to consider. For instance, to determine the probative value of the challenged evidence, a court considers not only its probative force but also "the proponent's need for that item of evidence." *Gigliobianco*, 210 S.W.3d at 641. "When the proponent [of an item of evidence] has other compelling or undisputed evidence to establish the proposition or fact that the [item of evidence] goes to prove, the [probative value of the item of evidence] will

40

weigh far less than it otherwise might in the probative-versus-prejudicial balance."

*Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990) (op. on reh'g).

When granting the Rule 403 objection during the punishment phase, the trial court may have found that the State's need for the deadly-conduct evidence was weak because the State introduced "other compelling and undisputed evidence"—for instance, Cockerham's indecency-with-a-child conviction—for the jury to consider in assessing Cockerham's punishment. In support of his new-trial motion, Cockerham not only argued that the deadly-conduct evidence could not be used to impeach his potential character witnesses testifying about his non-violent nature, but he also argued that his indecency-with-a-child conviction could not be used for impeachment because indecency with a child is not a crime of inherent violence. Only past violent offenses that he had committed would be relevant to impeach character witnesses testifying about his non-violent character. Assuming that it agreed, the trial court, when determining Cockerham's motion for new trial, could have found that the State's need for the deadly-conduct evidence to impeach Cockerham's character witnesses during the guilt-innocence phase would have been stronger than it was during the punishment phase because the State could not use the indecency conviction to cross-examine the witnesses.[6] The trial court could have

---

[6] We make no determination whether it would have been permissible for the State to attempt to impeach Cockerham's character witnesses during the guilt-innocence phase by cross-examining them about Cockerham's indecency-with-a-child

found that the State's need for the deadly-conduct evidence to impeach the potential character witnesses was much greater than its need for the evidence during its case-in-chief in the punishment phase, in turn making the evidence's probative value stronger than it was during the punishment phase.

We also note that the trial court received additional information about the deadly-conduct charge during the new-trial proceedings. As part of his new-trial evidence, Cockerham offered the criminal complaint filed against him for the deadly-conduct offense. The complaint reflected that eyewitnesses had told police that a Ford Taurus had driven towards a crowd of people attending a powder puff football game at the Worthing High School football field. The complaint stated that witnesses had seen one or two males get out of the car and start firing into the crowd. And it reflected that one witness had identified Cockerham from a photospread as

conviction. As discussed, Cockerham had the burden to show that his trial counsel performed deficiently. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). In support of his deficiency assertion, Cockerham contends that it was unreasonable for trial counsel to believe that the deadly-conduct evidence could be used to impeach his character witnesses during the guilt-innocence phase. He claims such belief was unreasonable because counsel could have raised a Rule 403 objection to that evidence. But, for this argument to be successful, Cockerham had to show that the trial court would have abused its discretion in denying the Rule 403 objection to the deadly-conduct evidence during the guilt-innocence phase. *See Cavitt v. State*, 507 S.W.3d 235, 258 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). If it would have been an abuse of discretion for the trial court to support a denial of the Rule 403 objection based on a determination that the indecency offense was inadmissible, Cockerham had the burden to show that, but he did not. To the contrary, Cockerham argued in the trial court and argues on appeal that the State could not use the indecency offense to impeach his character witnesses during the guilt-innocence phase.

one of the gunmen. The complaint further stated that Cockerham had admitted that he was driving the Ford Taurus. In contrast, during the punishment phase, the State sought to admit the recorded statement that Cockerham made to police in which Cockerham allegedly admitted to driving the car onto the football field. In seeking to admit the recorded statement during the punishment phase, the State made no mention of an eyewitness identifying Cockerham as one of the gunmen. This may have provided an additional basis for the trial court to have found, during the new-trial proceeding, that the deadly-conduct evidence had a higher probative value than it did during the punishment phase.

The trial court also could have found that the remaining four *Gigliobianco* factors weighed in favor of permitting the deadly-conduct evidence to be used for impeachment purposes. For instance, the trial court could have found that a written limiting instruction in the jury charge would have minimized both the risk of the jury improperly relying on the impeachment evidence in reaching its verdict and the risk that the evidence would have confused or mislead the jury. *See James v. State*, 623 S.W.3d 533, 549 (Tex. App.—Fort Worth 2021, no pet.). In addition, the evidence would not have taken much time to present nor would it have been repetitive of other evidence. *See Gigliobianco*, 210 S.W.3d at 641–42. Thus, the trial court, during the new-trial proceeding, could have reasonably determined that a Rule 403 objection to the deadly-conduct evidence, when used for impeachment, would have been

overruled and that it was reasonable for trial counsel to believe that the deadly-conduct evidence would have been admissible to impeach testimony about his non-violent character.

Cockerham also argues that it was unreasonable for trial counsel to believe that the State could impeach testimony about his non-violent character because trial counsel "could have sought to expunge the [deadly-conduct] case, making it impossible for the State to question witnesses about it." Texas Code of Criminal Procedure article 55.01(a)(2)(B) permits a person, who has been arrested, to expunge all records and files "relating to an arrest" when (1) the person was released, (2) the charge did not result in a final conviction, (3) the charge is no longer pending, (4) there was no court-ordered community supervision for the offense, and (5) prosecution of the person for the offense is no longer possible because the limitations period has expired. *See* TEX. CODE CRIM. PROC. art. 55.01(a)(2)(B). Cockerham asserts that all the criteria for expunction of the records relating to his arrest for deadly-conduct have been met, including the expiration of the three-year statute of limitations for that offense. *See* TEX. PENAL CODE § 12.01(8).

We note that none of new-trial evidence mentions the topic of an expunction. The affidavits of Cockerham's parents and trial counsel reflect that trial counsel was hired by Cockerham's parents five months before trial. Cockerham's parents signed a contract with trial counsel regarding the representation. The terms of the contract

44

were not part of the new-trial evidence, but Cockerham's mother, Mary, testified that trial counsel was hired to represent Cockerham "in this case."

An expunction proceeding is civil rather than criminal in nature. *Ex parte Enger*, 512 S.W.3d 912, 914 (Tex. App.—Houston [14th Dist.] 2016, no pet.). An action to expunge the records relating to Cockerham's arrest for deadly-conduct would not have been filed in the instant murder case. Instead, the action would have been filed as a separate proceeding. *See* TEX. CODE CRIM. PROC. art. 55.02, § (2)(a). Filing an expunction petition involves incurring expense, such as legal fees and payment of a filing fee. The record is silent regarding whether trial counsel discussed filing an expunction action with Cockerham, and, if he did, whether Cockerham wanted to pursue it. It is the defendant's burden to prove ineffective assistance of counsel. *See Strickland*, 466 U.S. at 687. When the record is silent concerning the reasons for trial counsel's actions, a court does not engage in speculation to find ineffective assistance of counsel. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). Because the record was silent regarding expunction, the trial court may have reasonably declined to find ineffective assistance of counsel on that basis.

In sum, the record sufficiently supported a finding by the trial court that it was reasonable for trial counsel not to call character witnesses during the guilt-innocence phase to testify about Cockerham's non-violent character because they could have

been subjected to cross-examination about the deadly-conduct charge. *See Carter v. State*, 506 S.W.3d 529, 539–40 (Tex. Houston [1st Dist.] 2016, pet. ref'd) (concluding that counsel's decision not to elicit testimony of defendant's reputation for peacefulness was objectively reasonable because it would have allowed State to cross-examine reputation witnesses about whether they were aware of defendant's specific acts of violence). The record also supported a finding that Cockerham would not have benefited from the character witnesses' testimony. *See Goodin v. State*, No. 01-20-00733-CR, 2022 WL 3650124, at *13 (Tex. App.—Houston [1st Dist.] Aug. 25, 2022, no pet.) (mem. op., not designated for publication) (concluding that trial court could have reasonably determined that omitted good-character testimony, which could have been offered during guilt-innocence phase, would not have benefitted appellant, in part, because State could have then introduced its own character evidence, including otherwise inadmissible evidence of extraneous bad acts or offenses, to rebut implications of appellant's good-character evidence). The trial court's implied findings supported a conclusion that Cockerham did not carry his burden of showing that trial counsel's performance was deficient during the guilt-innocence phase. The trial court could have also concluded that the omitted evidence was not so compelling as to have had any effect on the jury's verdict and, thus, Cockerham did not carry his burden of showing prejudice. *See Strickland*, 466 U.S. at 694; *Washington v. State*, 417 S.W.3d 713, 724–25 (Tex. App.—Houston [14th

Dist.] 2013, pet. ref'd) (recognizing that, to evaluate prejudice in context of failure to investigate or present mitigating evidence, court must "compare the evidence presented by the State with the evidence the jury did *not* hear due to counsel's failure to investigate"(internal quotation marks omitted)). We hold that the trial court did not abuse its discretion by denying the motion for new trial on the ground that trial counsel's failure to investigate and call available witnesses to testify about Cockerham's non-violent character constituted ineffective assistance of counsel during the guilt-innocence phase.

### E. Punishment Phase Character Witnesses

In his fourth issue, Cockerham contends that trial counsel was "ineffective by failing to investigate and call any character witnesses during the punishment phase."

A criminal defense attorney has a duty to make an independent investigation of the facts of a case and to seek out and interview potential witnesses. *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990); *Toledo v. State*, 519 S.W.3d 273, 287 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). In defining this obligation, the United States Supreme Court has stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Here, relevant to trial counsel's duty to investigate, the new-trial evidence showed that, before trial, counsel spoke with Joe and Mary both in-person and on the telephone, met with

47

Cockerham three times in jail, and spoke with Arlene. Counsel's affidavit reflected that he had learned of Cockerham's criminal history, including the conviction for indecency with a child and the deadly-conduct charge. And it reflected that counsel had learned that Cockerham had a girlfriend with whom he had a son.

While the record shows that trial counsel spoke with Mary and Joe before trial, Cockerham correctly points out that trial counsel did not seek out or speak with the other six potential witnesses who attested in the new-trial proceedings that they would have provided character testimony at the punishment phase. "An attorney's decision not to investigate or to limit the scope of the investigation receives a 'heavy measure of deference' and is assessed in light of all the circumstances to determine whether reasonable professional judgment would support the decision." *Toledo*, 519 S.W.3d at 287 (quoting *Strickland*, 466 U.S. at 691). Here, trial counsel testified that he "did not seek out any of Mr. Cockerham's relatives or family friends to interview" because "any favorable character evidence they could have provided would have caused . . . all of his criminal history to come in at punishment." He stated that he "did not want to call any character witnesses for Mr. Cockerham during punishment" because, "if [he] did, the prosecutor was going to cross-examine them about Mr. Cockerham's criminal history." And he "did not want Mr. Cockerham's criminal history introduced during punishment and calling character witnesses would have guaranteed that."

48

Cockerham acknowledges that the decision whether to present witnesses is largely a matter of trial strategy. *See Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd). But he criticizes the strategic reason offered by trial counsel for deciding not to seek out or call character witnesses. Cockerham asserts that "a strategic decision not to call any character witnesses at punishment can only be made if trial counsel is aware of potential character witnesses and what kind of testimony they will give." (Emphasis omitted.) *See Lair v. State*, 265 S.W.3d 580, 595 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) ("[C]ounsel can only make a reasonable decision to forgo presentation of mitigating evidence after evaluating available testimony and determining it would not be helpful."); *Shanklin*, 190 S.W.3d at 164 ("[A]n attorney's decision not to present particular witnesses at the punishment stage may be a strategically sound decision if the attorney bases it on a determination that the testimony of the witnesses may be harmful, rather than helpful to the defendant."). Cockerham argues that trial counsel could not have evaluated whether the character witnesses' testimony would be helpful or hurtful because counsel did not know the content of their testimony.

Assuming, without deciding, that trial counsel performed deficiently in not seeking out or calling the identified character witnesses, the trial court could have reasonably determined that Cockerham did not show prejudice—the second

*Strickland* prong.[7] To meet the prejudice prong, Cockerham was required to show that there was "a reasonable probability that, but for counsel's errors, the sentencing jury would have reached a more favorable verdict." *See Ex parte Rogers*, 369 S.W.3d at 863. Here, the applicable punishment range was 15 years to 99 years or life in prison, plus a $10,000 fine. The jury assessed Cockerham's punishment at 80 years in prison, less than the State's requested punishment of life in prison and more than the 15-year sentence sought by the defense. Thus, to establish prejudice, Cockerham needed to show a reasonable probability that, but for trial counsel's errors—that is, but for his failure to investigate and to call the identified character witnesses—the jury would have assessed a sentence of less than 80 years in prison. It was not enough for Cockerham to show that the punishment-stage errors "had some conceivable effect on the outcome of the punishment assessed." *Id.* In the context of a failure to investigate or present mitigating evidence, we assess prejudice by reweighing the

---

[7]     As discussed in footnote 5, the trial court could have determined that trial counsel did not perform deficiently in not calling Mary to testify at the punishment phase because, as counsel stated in his affidavit, Mary feared being killed if she testified at trial. We note that trial counsel also testified in his affidavit that, when he spoke with Joe, he discovered that Joe "was unaware that his son had ever been to [prison] so it did not seem like he knew his son well." From this, the trial court could have determined that trial counsel was justified in not calling Joe as a character witness because Joe's testimony would not have been beneficial. *See Ex parte Ramirez*, 280 S.W.3d at 853; *see also Blaylock v. State*, No. 08-01-00464-CR, 2003 WL 361295, at *4 (Tex. App.—El Paso Feb. 20, 2003, no pet.) (not designated for publication) (concluding that not calling witness who "had no relevant information" was not ineffective assistance of counsel).

aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the motion for new trial. *See Wiggins*, 539 U.S. at 534–36.

Regarding the aggravating evidence, the jury was permitted to consider the evidence admitted during the guilt-innocence phase supporting Cockerham's murder conviction. This included evidence that Cockerham shot James 10 times and that he repeatedly shot James in the back of the head as James lay on the ground. The jury found Cockerham guilty, implicitly rejecting his self-defense claim, thereby indicating that it believed that Cockerham, not James, had been the aggressor. During its closing argument, the State emphasized each gunshot wound and shot fired by Cockerham to highlight the violence of the murder.

During the punishment phase, the jury was informed that Cockerham had pleaded true to the enhancement allegation that he had been previously convicted of the offense of indecency with a child. The State introduced the 2016 judgment of conviction for the indecency offense into evidence. The judgment reflected that Cockerham had pleaded guilty to the indecency offense, a second-degree felony, and had received a two-year prison sentence. But no information about the allegations underlying the indecency offense were adduced. Thus, the jury never learned that the indecency charge arose from allegations that Cockerham had made his younger half-sister perform oral sex on him multiple times when she was between eight and ten years old. Nor did they hear that Cockerham had also been charged with

51

aggravated-sexual assault related to those allegations. The State offered no other evidence of Cockerham's past criminal arrests and charges or bad acts, and it offered no other character evidence against him. The only witness called by the State was James's sister. She testified that James's family missed him, described his good qualities, and testified that he had a close relationship with his 15-year-old daughter.

The defense did not offer new mitigating evidence at the punishment phase. Instead, as reflected by its closing statement during the punishment phase, the defense relied on mitigating evidence admitted during the guilt-innocence phase to support its request that the jury assess the lowest possible sentence of 15 years. The defense pointed to evidence that Cockerham had not sought out James on the day of the shooting, rather, James had gone to Cockerham's house where Cockerham killed him during a heated argument. The defense's primary mitigation theory revolved around Cockerham's youth and his ability to be rehabilitated. The defense emphasized that Cockerham was 27 years old at the time of trial and that he was only 19 and 23 years old, respectively, when he committed the indecency and murder offenses. And the defense pointed out that the neighborhood where Cockerham had grown up and where the shooting occurred was a "rough area" where "everyone carries a gun" and violence is a "way of life." The defense also argued that he had taken responsibility for the indecency offense by pleading guilty to it and by serving time in prison. Based on those mitigating factors, the defense asked the jury to

sentence Cockerham to the minimum sentence, suggesting that he could be reformed.

At the new-trial hearing, Cockerham offered the in-court and affidavit testimony from eight witnesses who attested that they would have testified at the punishment stage. As Cockerham summarized in his brief, the witnesses' testimony generally would have included

> that [Cockerham] was a good, kind man who worked to provide for his son and stepdaughter and was actively involved in their lives. They would have testified he supported his girlfriend through a cancer diagnosis and COVID, served as a caretaker to his elderly, bedridden grandfather, lent out money to those in need, and even fed the homeless on Thanksgiving.

The witnesses also described Cockerham as "caring," "loving," "nice," "laid back," "family oriented," "hard working," "supportive," a "good father," and a "good man" with a "good heart."

As the State points out, the introduction of the witnesses' character testimony at the punishment phase would have opened the door for the State to cross-examine the witnesses about their awareness of Cockerham's indecency conviction and the details of that case. *See Harrison*, 241 S.W.3d at 27–28 (holding that testimony that defendant was "good" and "sweet" boy had opened door to extraneous offenses); *Wilson*, 71 S.W.3d at 350–51 (recognizing that punishment-phase character witness's awareness of specific instances of conduct may be tested on cross-examination). More specifically, it may have opened the door for the State to cross-

53

examine the witnesses about information of which the jury was otherwise unaware, such as whether the witnesses knew that Cockerham had been charged with aggravated sexual assault and that he had forced his eight-to-ten-year-old half-sister to perform oral sex on him numerous times. During the new-trial hearing, the State gave a preview of the type of cross-examination it may have engaged in had the character witnesses testified. For instance, the State questioned Cockerham's girlfriend, S. Johnson, whether she knew about his conviction for indecency with a child and about his status as a registered sex offender. She stated that she was aware of that information and had known about it when she started dating him. The State asked her whether that information concerned her with respect to her eight-year-old daughter, and she stated that the information did not cause her concern. But, when asked whether she knew that, in the indecency case, Cockerham had pleaded guilty to forcing the child victim to perform oral sex on him on multiple occasions, Johnson admitted that she had never heard that information or any of the details of the case.

In his brief, Cockerham points out that "the State noticed five pages worth of extraneous offenses that it intended to introduce at punishment under [Code of Criminal Procedure] Article 37.07." While the State did not introduce evidence of other extraneous offenses aside from the indecency conviction, the State may have been permitted to cross-examine the character witnesses about some of Cockerham's other extraneous offenses. As discussed, in addition to the indecency conviction,

54

Cockerham's criminal history included dismissed charges for the offenses of deadly conduct, fraudulent possession of identifying information while on bond, an arrest for criminal trespass, and a conviction for criminal mischief. The State's cross-examination of the character witnesses and of Cockerham at the new-trial hearing suggested that the State may have sought not only to cross-examine the character witnesses about those charges but also about a charge of tampering with evidence, assaulting Johnson, selling drugs, his membership in a street gang, engaging in fights while in jail, and being a felon in possession of a firearm.

Any benefit the character witnesses' testimony might have provided would have been counterbalanced by the State's cross-examination of them, which would have limited the type of mitigation argument that the defense could have made to the jury. The defense had suggested that the jury should give Cockerham the lowest possible sentence because he could be reformed. Among the mitigating factors cited, the defense had pointed out that Cockerham was young and had taken responsibility for the indecency offense. The subtext of the defense's argument was that Cockerham had committed only the offenses of which the jury was aware and that he was capable of reform. The State's cross-examination of the character witnesses would have undermined the defense's argument that he was worthy of a low sentence and would have made it difficult to suggest that Cockerham was capable of reform. While Cockerham argues that the character testimony from his family and friends

55

would have humanized him, the State's cross-examination had the potential to dehumanize him and make the jury more receptive to the State's argument that he could not be rehabilitated and that giving him a life sentence was the only way "to keep this community safe."

Given the potential cross-examination material, the record was sufficient for the trial court to have found, after reviewing the total aggravating and mitigating evidence, that Cockerham did not show a reasonable probability that the outcome of the punishment phase would have been different—that is, that his punishment would have been less—had trial counsel investigated and called the character witnesses to testify. *See Wiggins*, 539 U.S. at 534–36; *see also Ex parte West*, No. WR-78,439-02, 2016 WL 9000801, at *14 (Tex. Crim. App. June 8, 2016) (not designated for publication) (holding that habeas applicant had not shown that jury would have reached different punishment decision if trial counsel had called his two brothers to provide mitigation testimony because cross-examination could have revealed harmful information); *Ex parte McFarland*, 163 S.W.3d 743, 757–58 (Tex. Crim. App. 2005) (concluding that defense counsel's decision not to call capital-murder defendant's former attorney to testify as mitigation witness at punishment phase did not constitute ineffective assistance because, although his testimony would have been beneficial, State could have cross-examined him about potentially hazardous topics); *Garcia v. State*, No. 13-13-00014-CR, 2014 WL 7205453, at *3 (Tex.

App.—Corpus Christi Dec. 15, 2014, pet. ref'd) (mem. op., not designated for publication) (holding attorney's decision not to call appellant's daughters to testify as character witnesses at punishment phase was not ineffective assistance of counsel because he anticipated that State would cross-examine them to highlight previous indecency case). Based on that finding, the trial court could have concluded that Cockerham did not satisfy the second *Strickland* prong requiring him to show prejudice from trial counsel's errors. We hold that the trial court did not abuse its discretion when it denied Cockerham's motion for new trial on the ground that trial counsel's failure to investigate and call available character witnesses constituted ineffective assistance of counsel during the punishment phase.

We overrule Cockerham's fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).